HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TERESA LOUISE HALL,

       Plaintiff,

    v.

CAROLYN W. COLVIN, in her capacity
as Acting Commissioner of the Social
Security Administration,

       Defendant.

CASE NO. C14-1071RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court via 42 U.S.C. § 405(g) on review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff Teresa Hall's application for disability insurance benefits and supplemental security income.  The court has considered the parties' briefs and the Administrative Record ("AR").  For the reasons stated herein, the court REVERSES the Commissioner's decision and REMANDS this case for further proceedings consistent with this order.  The court directs the clerk to enter judgment for Ms. Hall.

## II.  STANDARD OF REVIEW

In a case like this one, where the court reviews the decision of an administrative law judge ("ALJ") to deny disability benefits, the court must generally affirm the ALJ's decision where substantial evidence supports it. *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1222 (9th Cir. 2009) ("Substantial evidence means more than a mere scintilla but less

ORDER – 1

1    than a preponderance; it is such relevant evidence as a reasonable mind might accept as

2    adequate to support a conclusion.") (citation omitted).  In certain circumstances, such as

3    when an ALJ rejects a claimant's testimony about the severity of her impairments, a

4    higher standard applies.  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006)

5    (requiring "specific, cogent reasons" for rejecting claimant's testimony, and "clear and

6    convincing evidence" where there is no evidence of malingering).  Similarly, an ALJ can

7    reject the uncontradicted opinions of a treating or examining medical provider only where

8    clear and convincing evidence supports that decision.  *Lester v. Chater*, 81 F.3d 821, 830

9    (9th Cir. 1995).  Even where medical evidence contradicts the opinion of a treating or

10   examining provider, the "ALJ may only reject it by providing specific and legitimate

11   reasons that are supported by substantial evidence."  *Garrison v. Colvin*, 759 F.3d 995,

12   1012 (9th Cir. 2014).  The court does not defer to the ALJ's legal conclusions.  *Bray*, 554

13   F.3d at 1222.

14       A five-step process determines whether an applicant is disabled.  *See Treichler v.*

15   *Comm'r of SSA*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014); 20 C.F.R. §§ 404.1520(a)(4)(i)-

16   (v), 416.920(a)(4)(i)-(v).  The burden of proof is on the applicant in the first four steps,

17   which are the prerequisites of a prima facie case of disability.  *Treichler*, 775 F.3d at

18   1096 n.1.  In the first step, the applicant must show that she did not engage in substantial

19   gainful activity during a relevant time period.  20 C.F.R. § 404.1520(a)(4)(i).  If she did,

20   then she is not disabled.  If she did not, then the claimant must show at the second step

21   that she has a "severe medically determinable physical or mental impairment" or

22   combination of impairments that are collectively severe.  20 C.F.R. § 404.1520(a)(4)(ii).

23   The severe impairment must generally last at least a year.  *Id.*; *see also* 20 C.F.R.

24   § 416.909 (setting "duration requirement" for impairment).  If an applicant shows a

25   severe impairment of sufficient duration, she must show at the third step that over the

26   course of at least a year, her impairment "meets or equals" an impairment listed in

27   applicable regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If it does, she is disabled.  If not,

28   ORDER – 2

1    the ALJ must determine, between step three and step four, the applicant's RFC, which is

2    an assessment of the applicant's "ability to work after accounting for her verifiable

3    impairments." *Bray*, 554 F.3d at 1222-23.  The applicant must demonstrate at step four

4    that her RFC is such that she cannot perform her past relevant work.  20 C.F.R.

5    § 404.1520(a)(4)(iv) (noting that an applicant who can perform past relevant work is not

6    disabled).  If she cannot, then the burden shifts to the SSA to demonstrate that her RFC

7    permits her to perform other jobs that exist in substantial numbers in the national

8    economy.  *See Bray*, 554 F.3d at 1223 (describing allocation of burdens in five-step

9    process).

10                                  **III.   ANALYSIS**

11        The ALJ held a hearing in September 2012.  Ms. Hall and a vocational expert

12   testified.  In an October 2012 written decision following the hearing, the ALJ determined

13   that Ms. Hall suffered from a number of severe impairments: chronic obstructive

14   pulmonary disorder, obesity, hypertension, diabetes mellitus, complications following an

15   October 2011 cardiovascular event (which the court will refer to as a "stroke," for

16   simplicity) and an affective disorder.  Although Ms. Hall initially claimed a disability that

17   onset in August 2010, she amended that date to October 27, 2011, the date of her stroke.

18   The ALJ found that she had not engaged in substantial gainful activity over the relevant

19   time period, that her impairments did not meet or equal a listing, and that she could not

20   perform her past relevant work.  The ALJ assessed an RFC that the court will later

21   examine in more detail.  For now, it suffices to note that the ALJ concluded that RFC left

22   Ms. Hall able to perform jobs that exist in substantial numbers.

23        Ms. Hall challenges the ALJ's finding at the third step that Ms. Hall's impairments

24   did not meet or equal a listed impairment.  As to the ALJ's RFC determination, she

25   contends that the ALJ improperly discredited her testimony at the hearing about the

26   effects of her impairments.  She contends that the ALJ improperly discounted the

27   opinions of physicians and other medical providers who examined or treated her, relying

28   ORDER – 3

1
2
3
4
5
6
7

instead on the opinions of providers who never examined her.  Ms. Hall alleges that these errors and others led to errors in the ALJ's assessment of her RFC.  These are the only errors to which Ms. Hall points; they are therefore the only issues the court considers in this appeal.  *See Carmickle v. Comm'r of SSA*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (refusing to review ALJ's conclusion when plaintiff "failed to argue th[e] issue with any specificity in his briefing"); *Lewis v. Apfel*, 236 F.3d 503, 517 n. 13 (9th Cir. 2001) (limiting review to issues plaintiff raises).

8
9
10
11
12
13
14

The court summarizes its ruling as follows:  Plaintiff does not persuade the court that the ALJ erred at step three in determining that she had no impairment that met or equaled a listed impairment.  The ALJ made errors in assessing Ms. Hall's credibility and in discounting evidence from Ms. Hall's medical providers as to both her physical capacity and the impact of her mental health on her capacity to work.  Because the court concludes that it is reasonably likely that an ALJ would reach a different RFC assessment but for those errors, the court remands this case for additional proceedings.

15

**A.      The ALJ Did Not Err at Step Three.**

16
17
18
19
20
21
22
23
24
25
26

At step three of the sequential evaluation process, the ALJ must determine whether any of the claimant's impairments meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(4)(iii), 416.920(4)(iii).  The Listing of Impairments "describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a).  "If a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the 'Listing of Impairments,' then the claimant is presumed disabled at step three."  *Lewis*, 236 F.3d at 512.  At step three, the claimant bears the burden of proving that her impairment meets a Listing.  See *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  The ALJ need not, as a matter of

27

28      ORDER – 4

1    law, "state why a claimant failed to satisfy every different section of the listing of

2    impairments." *Gonzalez v. Sullivan,* 914 F.2d 1197, 1201 (9th Cir. 1990).

3         Ms. Hall contends that her October 2011 stroke left her with severe, lasting

4    difficulties with her right hand and lower extremities.  AR 39-43.  She claims that,

5    despite her counsel's specific and repeated references at the hearing, the ALJ failed to

6    consider whether her impairments meet Listing 11.04(B).  Dkt. # 9 at 2-5.  The

7    Commissioner contends that Ms. Hall argues only that the ALJ failed to consider whether

8    she met Listing 11.04(B) and not that her impairments rise to the Listing level. Dkt. # 10

9    at 10-11. The Commissioner also urges that Ms. Hall's medical records show that her

10   impairments do not meet the severity requirements of the Listing.  *Id.*

11        Listing 11.04(B) is the neurological listing for "central nervous system vascular

12   accident," with "[s]ignificant and persistent disorganization of motor function in two

13   extremities, resulting in sustained disturbance of gross and dexterous movements, or gait

14   and station (see 11.00C)," persisting for more than three months post vascular accident.

15   20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.04(B).  "Persistent disorganization of

16   motor function" is defined as "paresis or paralysis, tremor or other involuntary

17   movements, ataxia and sensory disturbances (any or all of which may be due to cerebral,

18   cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or

19   in various combinations." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.00C.

20   Assessment of an impairment characterized by persistent disorganization of motor

21   function "depends on the degree of interference with locomotion and/or interference with

22   the use of fingers, hands, and arms." *Id.*  Ms. Hall contends that her right hand

23   impairments and difficulties with ambulation satisfy the requirements of the Listing.

24        The ALJ assessed Listing 11.14 for peripheral neuropathy, which requires

25   "disorganization of motor function as described in 11.04B, in spite of prescribed

26   treatment."  20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.14.  This Listing requires the

27   same motor function limitations as the Listing raised by Ms. Hall.  The ALJ found that

28   ORDER – 5

1
2
3
4
5
6
7

none of Ms. Hall's impairments "were accompanied by disorganization of motor function in two extremities resulting in a sustained disturbance of gross dexterous movement or gait and station."  AR 18.  While this finding may have been directed to Listing 11.14, the result is equally relevant to and addresses the requirements of Listing 11.04(B). Thus, even if the ALJ should have evaluated the impairment under Listing 11.04(B), the error is harmless.  *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error is harmless when inconsequential to the ultimate non-disability determination).

8
9
10
11
12
13
14
15
16
17
18
19

Moreover, the record supports the finding that Ms. Hall did not suffer from the requisite motor function impairments in two extremities.  Ms. Hall initially suffered significant impairment as a result of her October 2011 stroke.  AR 720.  But the severity of these impairments waned as Ms. Hall recovered.  By January 2012, Shannon Latta, the advanced registered nurse practitioner who saw Ms. Hall frequently in the aftermath of her stroke, noted that Ms. Hall had increased strength and sensation in her right hand, no longer used a walker, and ambulated unassisted.  AR 842.  Occupational therapy records from the same time period reported that Ms. Hall could do her hair grooming by herself. AR 716.  In May 2012, Ms. Hall was independent in basic self-care.  AR 910.  And, although fine motor coordination in her right hand continued to be slower than her left, she was "using her hand quite functionally" and initiated use of the right hand without hesitancy. *Id.*

20
21
22
23
24
25
26

As her recovery progressed, Ms. Hall's use of her right hand and lower extremities improved significantly.  Treatment notes reflect as much.  For example, the discharge notes at the end of her two-week inpatient stay at a rehabilitation hospital following her stroke showed that right-side weakness in both her upper and lower extremities had improved, and that she was largely capable of functioning on her own.  AR 749-50.  The record supports the ALJ's findings that her impairments were not accompanied by disorganization of motor function with sustained disturbances in two extremities.  Ms.

27
28

ORDER – 6

1    Hall did not establish that she meets each of the required characteristic of any Listing,

2    including Listing 11.04(B).  The ALJ made no error at step three.

3    **B.    The ALJ Committed Errors that May Have Resulted in an RFC That Did Not Correctly Reflect Ms. Hall's Ability to Work.**

4    The ALJ concluded that Ms. Hall had an RFC that permitted her to perform a

5    range of sedentary work.  The ALJ concluded that she could lift or carry no more than 10

6    pounds occasionally or frequently, stand or walk for 2 of 8 hours, sit for 6 to 8 hours,

7    frequently climb stairs or ramps, balance, stoop, kneel, crouch, and crawl.  AR 19-20.

8    The ALJ concluded she could not climb ropes, ladders, or scaffolds.  *Id.*  The ALJ ruled

9    that despite evidence of carpal tunnel syndrome affecting her left hand, she could

10   frequently finger with that hand.  *Id.*  The ALJ concluded that Ms. Hall must avoid

11   concentrated exposure to extreme temperatures and hazards, must have no more than

12   occasional contact with coworkers and the public, must work only at a regular pace with

13   no more than a frequent need for close attention to detail, and must in work with an

14   emphasis on things or objects rather than people.  *Id.*  The ALJ also concluded that she

15   requires two additional breaks, of normal duration, to be taken as her needs dictate.  *Id.*

16       Ms. Hall contends that the ALJ erred in assessing her functional limitations.  In

17   some respects, the court disagrees.  For example, she argues that the ALJ did not fully

18   account for the limitations that her obesity imposes.  Yet she does not point to any

19   obesity-related limitation missing from the RFC, much less show where in the record

20   there is evidence to support the determination that she has that limitation.  She succeeds,

21   however, in pointing out some errors.  The ALJ chose not to credit (or to credit only

22   partially) Ms. Hall's testimony as well as evidence from several of her medical providers.

23   In several instances, neither the ALJ's reasoning nor the record supports that choice.

24       **1.    Ms. Hall's Testimony and the ALJ's Adverse Credibility Determination**

25       Ms. Hall's testimony at the hearing painted a more restrictive picture of her ability

26

27   to function than the ALJ's RFC.  She complained of lack of sensation in much of her

28   ORDER – 7

1  right hand and weakness in her right leg that gave her a "hard time walking . . . ."  AR 40.

2  She testified that she had severely limited use of her right hand, including an inability to

3  clean herself after using the toilet, an inability to carry a glass of water, difficulty

4  applying makeup, and difficulty writing or typing.  AR 42-43, 45.  She testified that

5  physical therapy helped improve her condition after her stroke, but that improvement

6  ceased after physical therapy ended in February 2012.  AR 46-47.  Ms. Hall testified that

7  her physical limitations made her "panicky" and resulted in several crying spells each

8  day.  AR 40-41.  She explained that she became agitated when she could not plan her day

9  or was forced to depart from routine.  AR 41.

10  The ALJ took a dim view of Ms. Hall's testimony, finding that although her

11  impairments "could reasonably be expected to cause some of [her] alleged symptoms,"

12  he could not credit all of her testimony.  AR 21.  Some of the ALJ's reasons for the

13  adverse credibility finding are grounded in the medical record, where Ms. Hall's

14  providers reported that she was functioning better than her testimony suggested.  Some of

15  the ALJ's reasons, on the other hand, are baffling.  The ALJ seized upon Ms. Hall's

16  testimony about her inability to raise her arm above her head, noting that she was dressed

17  at the hearing in what the ALJ described as an "overhead blouse."  AR 22.  The ALJ

18  asked Ms. Hall no questions about her blouse, and made no mention of Ms. Hall's

19  testimony that both her mother and her daughter (who lived with her) helped her dress.

20  AR 43, 50.  The ALJ criticized Ms. Hall for appearing at the hearing without a walker or

21  cane, ignoring that the only questions he asked about her use of a walker targeted the

22  period 3 months after her stroke.  AR 22, 41-42.  Ms. Hall's appearance at the hearing

23  came almost 11 months after her stroke.

24  In a case like this one, where there is no evidence of malingering, an ALJ must

25  point to "clear and convincing evidence" to reject as incredible a claimant's subjective

26  testimony about her medical condition.  *Greger*, 464 F.3d at 972.  The ALJ's decision to

27  discredit Ms. Hall based on her appearance at the hearing (in a blouse and without a

28  ORDER – 8

walker or cane) falls well short of the clear and convincing standard.  The court does not rule out that the ALJ could properly reach an adverse credibility finding by comparing Ms. Hall's testimony to the medical evidence.  For example, there is evidence that Ms. Hall had ceased to use a walker by late January 2012.  AR 716-17.  But, because the court cannot ascertain to what extent the ALJ's improper attacks on Ms. Hall's credibility influenced the overall credibility determination, the ALJ must reassess Ms. Hall's credibility on remand.

### 2.     Ms. Hall's Physical Functioning

In assessing Ms. Hall's physical capacity, the ALJ relied primarily on two physicians, Dr. Eugene Kester and Dr. Olegario Ignacio, who reviewed Ms. Hall's medical records in 2012.  AR 91-104, 111-124.  The limitations that they assessed based on those records jibe well, in some respects, with the medical providers who treated or examined Ms. Hall.  Those records show that Ms. Hall generally progressed positively in recovering from her stroke.  As noted, she was discharged from her two-week inpatient rehabilitation assignment in November 2011 with an encouraging evaluation.  AR 749-50.  Later results are also indicative of good recovery.  AR 973-75 (stress-test EKG from May 2012 showing normal results).  Ms. Latta also reported positively.  AR 910 (noting in May 2012 that Ms. Hall "continues to be independent with all of her basic self-care," and was "doing more around the house, including cooking, cleaning, and yard work").  The ALJ could not, however, rely on the opinions of these non-examining providers to reject the opinions of examining or treating providers, absent specific and legitimate reasons. *Lester*, 81 F.3d at 831.

The ALJ was appropriately skeptical of some of the medical evidence from treating providers.  The ALJ correctly noted that a one-paragraph letter from Dr. Alma Garcia, an osteopathic physician who worked with Ms. Hall during her initial rehabilitation, established only that Ms. Hall could not return to her past relevant work.  AR 741, 23.  The ALJ gave little weight to a September 2011 evaluation from Dr. Dan

ORDER – 9

1     Phan that both pre-dated Ms. Hall's stroke and overestimated her functional capacity.

2     AR 526-28, 23.  The court finds no error in the ALJ's assessment of those sources.

3          The ALJ did not, however, offer an adequate basis to discredit evidence from Ms.

4     Latta.  Ms. Hall points to a March 2012 "Ability to Do Work" evaluation in which Ms.

5     Latta asserted that Ms. Hall had greater physical limitations than the ALJ accepted.

6     AR 835-841.  Ms. Latta's ultimate conclusion was that Ms. Hall could not work in the

7     aftermath of her stroke.  Some of that opinion was based on her assessment of Ms. Hall's

8     mental health, but her opinion also included objective findings as to her physical

9     capacity.  She indicated that Ms. Hall had grip strength in her right hand measuring just 2

10    out of 5, compared to strength of 5 out of 5 in her left hand.  She noted that Ms. Hall

11    lacked dexterity and fine motor control in her right hand.  She assessed her upper

12    extremity strength at 2 out of 5 on both sides.  AR 836-37.  She assessed lower extremity

13    strength at 5 out of 5 on her left side, and 4 out of 5 on her right.

14         Despite these findings, the ALJ afforded "little weight" to Ms. Latta's conclusions

15    because they lacked "objective medical findings."  AR 23.  The ALJ cited only the lower

16    extremity measurements, and stated that they "appear to be recapitulations of what the

17    claimant had told Ms. Latta."  AR 23.  The court cannot discern why the ALJ believed

18    Ms. Latta's numerical assessments to be based on Ms. Hall's subjective reporting, rather

19    than measurements of Ms. Hall's strength.  The court notes, moreover, that although

20    evidence from Ms. Latta alone is "other source" evidence entitled to less deference than

21    evidence from a physician, *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014), her

22    evaluation of Ms. Hall was signed by Dr. Deems Okamoto, a physician.  The same is true

23    of a one-page "Pain Limitation Questionnaire" that Ms. Latta completed at about the

24    same time as her March 2012 "Ability to Do Work" evaluation.  AR 834.  That

25    questionnaire focused on the pain Ms. Hall suffered on her right side as a result of the

26    stroke.

27

28    ORDER – 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The ALJ also afforded "little weight" to Ms. Latta's determination on the questionnaire that Ms. Hall's pain would cause her to miss at least two days of work per month. AR 23. Again, the ALJ pointed to a lack of "specific and objective medical findings." AR 23. That criticism, standing alone, has little merit when assessing pain. Ms. Latta identified the stroke as the reason for Ms. Hall's pain, and no evidence suggests that it is unreasonable to expect pain in the aftermath of the stroke. As to the intensity of Ms. Hall's pain, the ALJ cannot dismiss Ms. Latta's assessments merely because she could not quantify the pain objectively. Pain defies objective quantification. *E.g.*, *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) ("Unlike most medical conditions capable of supporting a finding of disability, pain cannot be objectively verified or measured."). Instead, Ms. Latta relied on Ms. Hall's reporting as to her pain. That, standing alone, is not problematic. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) ("[O]nce the claimant produces objective medical evidence of an underlying impairment, the adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the severity of pain."). As noted, the ALJ was skeptical of Ms. Hall's reporting on her pain, but it does not follow that Ms. Latta's opinions were invalid. Ms. Latta opined only that pain would cause Ms. Hall to miss at least two days of work per month, and did so in an opinion that noted that Ms. Hall had good days and bad days with respect to her pain.

The court concludes that the ALJ lacked an adequate basis to dismiss Ms. Latta's opinions. The court does not suggest that the ALJ was required to credit fully those opinions. There are potential inconsistencies in evidence from Ms. Latta. For example, although her March 2012 evaluation declared Ms. Hall unable to work, evidence that the court has already cited from Ms. Latta's May 2012 treatment notes suggest improvement that might warrant a different conclusion. AR 910. In December 2011, not long after the stroke, Ms. Latta noted that Ms. Hall was "able to go out of [her] house, shopping, etc." AR 844; *see also* AR 842 (Jan. 6, 2012 note observing that Ms. Hall was "no longer

ORDER – 11

1    using a walker" and "doing better all the time" despite persistent pain"). But, because

2    Ms. Latta was the medical provider who most frequently saw Ms. Hall in the aftermath of

3    her stroke, and because she is almost certainly the source best suited to evaluate Ms.

4    Hall's day-to-day functioning, the court rules that the ALJ's did not articulate specific

5    and legitimate reasons that justify the rejection of her opinions. This is particularly true

6    of Ms. Latta's evaluations of Ms. Hall's right hand strength and dexterity. Ms. Hall is

7    right-handed. The ALJ incorporated no right hand limitation into Ms. Hall's RFC,

8    despite the ALJ's own acknowledgement that there was evidence of right hand

9    limitations. AR 22. These limitations are potentially critical, given that the jobs that the

10   vocational expert believed Ms. Hall could perform would appear to require strength and

11   dexterity in Ms. Hall's dominant hand. AR 56 (testifying that Ms. Hall could work as a

12   "table worker," "final assembler," or "hand packager"). In addition, if Ms. Hall's pain

13   were to cause her to miss at least two days of work per month, the vocational expert

14   testified that she could not work. AR 58. Proper assessment of evidence from Ms. Latta

15   is critical to accurately assessing Ms. Hall's RFC.

16        Before moving to Ms. Hall's mental health, the court observes that the record

17   contains evidence from both before and after Ms. Hall's stroke. There is no question that

18   Ms. Hall's health worsened substantially in the aftermath of the stroke. Evidence of Ms.

19   Hall's physical capacity before the stroke is perhaps relevant, but only when placed in

20   context of the stroke. For example, the ALJ relied on an August 2011 report from Ms.

21   Hall's mother to conclude that Ms. Hall was "less impaired than perhaps she realizes"

22   and could return to work. AR 24, 245-51. Without acknowledgment that Ms. Hall's

23   mother reported on her daughter's functional capacity *before* her stroke, the ALJ's

24   decision to place substantial weight on that report is dubious.

25        **3.    Ms. Hall's Mental Functioning**

26        Although various medical providers have offered different assessments of Ms.

27   Hall's mental health, the ALJ characterized her principal condition as an affective

28   ORDER – 12

1    disorder.  The evidence supports that characterization, although it would likely also

2    support other diagnoses.

3        The ALJ relied heavily on mental health record reviews from Dr. Kester and Dr.

4    John Robinson.  AR 22, 72-74, 125-126.  That by itself does not concern the court,

5    because much of what Dr. Kester and Dr. Robinson concluded is consistent with

6    evidence from treating or examining providers.  In some instances, however, the ALJ did

7    not provide specific and legitimate reasons for rejecting the more detailed opinions of

8    providers who actually examined or treated Ms. Hall.  *Lester*, 81 F.3d at 830 ("As a

9    general rule, more weight should be given to the opinion of a treating source than to the

10   opinion of doctors who do not treat the claimant.").

11       Dr. Dana Harmon, a psychologist, evaluated Ms. Hall in August 2011, before her

12   stroke.  AR 501-02.  Dr. Harmon conducted substantial psychological testing, including a

13   mental status exam, trails testing, the Rey 15 Test of Malingering, and a Personality

14   Assessment Inventory (PAI).  AR 503.  Ms. Hall's scores on many of these tests showed

15   borderline cognitive deficits and moderate/severe impairment levels.  *Id.*  Her anxiety,

16   depression, and health complaint measures were very elevated on the PAI.  *Id.*  Dr.

17   Harmon opined that Ms. Hall's observed confusion and ill health would "affect her focus,

18   concentration, and ability to attend to work-related issues."  AR 502.  Additionally, Dr.

19   Harmon opined that her observed depression and anxiety "make her more likely to feel

20   overwhelmed by her health problems, incline her toward social isolation, and affect her

21   ability to focus and think clearly."  *Id.*  Dr. Harmon diagnosed panic disorder and

22   agoraphobia "which affects her social functioning and ability to handle basic activities of

23   daily living," and depressive disorder including feelings of worthlessness and social

24   isolation.  AR 504.

25       Dr. Harmon found that Ms. Hall was severely impaired in her ability to

26   communicate effectively in a work setting with public contact.  AR 503.  She showed

27   marked impairment in her ability to communicate effectively in a work setting with

28   ORDER – 13

1    limited public contact and maintain appropriate behavior in a work setting.  *Id.*  Dr.

2    Harmon also found that, "[s]he is limited in her ability to manage stress or social

3    interactions."  *Id.*

4          The ALJ gave Dr. Harmon's opinion "some weight" because Dr. Harmon

5    "described the claimant having a limited ability to manage stress or social interactions,

6    but without providing objective medical findings for these conclusions."  AR 23.  As was

7    the case with the ALJ's choice not to acknowledge Ms. Latta's objective findings, the

8    court cannot discern why the ALJ believed that the numerous test results that Dr. Harmon

9    cited were not adequate objective findings.

10         The ALJ's decision not to credit fully Dr. Harmon's opinions calls the RFC

11   assessment into question.  Dr. Harmon assessed significant limitations to Ms. Hall's

12   ability to cope with stress and social situations.  For example, ALJ's determination that

13   Ms. Hall could tolerate occasional contact with coworkers and the public may not

14   withstand Dr. Harmon's assessment.

15         The ALJ properly declined to give weight to a psychiatric evaluation and "Ability

16   to Do Work" assessment from Ellen Schuler, a licensed mental health counselor who

17   evaluated Ms. Hall in June 2012.  AR 904-09.  Unlike Dr. Harmon's evaluation, there is

18   no indication that Ms. Schuler performed any objective testing of Ms. Hall.  She relied

19   entirely on unspecified "case notes" and a "clinical evaluation" (AR 908) that appeared to

20   consist of little more than repeating Ms. Hall's assessments of her own functioning.

21         Dr. Don Schimmel, a psychologist, evaluated Ms. Hall in July 2012.  AR 964.  He

22   found severe limitations in her ability perform activities within a schedule, perform

23   routine tasks without special supervision, adapt to changes in the work setting, and

24   maintain appropriate behavior in a work setting.  AR 966.  He noted marked impairment

25   in her ability to understand, remember, and persist in tasks by following detailed

26   instructions, make simple work related decisions, and communicate effectively in a work

27

28   ORDER – 14

1      setting.  AR 966.  The ALJ gave little weight to this opinion, finding that Dr. Schimmel

2      relied on Ms. Hall's reporting, rather than objective evidence.

3           "A physician's opinion of disability 'premised to a large extent upon the

4      claimant's own accounts of his symptoms and limitations' may be disregarded where

5      those complaints have been 'properly discounted.'"  *Morgan v. Comm'r of SSA*, 169 F.3d

6      595, 602 (9th Cir. 1999) (internal citations omitted).  The ALJ had an adequate basis to

7      query whether Dr. Schimmel merely parroted Ms. Hall's assessment of her mental

8      functioning.  His report includes several sections comprised entirely of Ms. Hall's quoted

9      statements.  For example, in describing the severity and frequency of Ms. Hall's

10     depressed mood, the assessment form quotes, "I'm depressed ¾ of the day. The other ¼

11     I'm sleeping in my chair," and "I'll cry for no reason."  AR 965.  The notes from his

12     mental exam appended to the report also include statements quoted directly from Ms.

13     Hall, particularly concerning her activities of daily living.  AR 970.  Because the ALJ

14     must reassess Ms. Hall's credibility, however, it may be necessary to reconsider how

15     much weight to give Dr. Schimmel's report.  In particular, the ALJ must consider

16     whether Ms. Hall's mental health (like her physical health) worsened after her stroke.

17          The court cannot be certain that the ALJ would reach the same determination as to

18     Ms. Hall's mental functioning after properly crediting Ms. Hall's testimony, evidence

19     from Dr. Harmon, and other evidence of Ms. Hall's mental health, including the

20     observations of Dr. Schimmel and Ms. Latta.  Remand is necessary.

21     **C.      Because the Record Permits Various Conclusions as to the Extent of Ms.
               Hall's Impairment, the Court Will Not Remand for an Award of Benefits.**
22
            Ms. Hall makes a cursory request that the court not only reverse the ALJ's
23
       decision, but remand for an award of benefits.  The credit-as-true rule permits the court to
24
       mandate an award of benefits in cases where evidence that the ALJ improperly rejected,
25
       when credited as true, establishes the claimant's disability conclusively.  *See Garrison*,
26
       759 F.3d at 1020 (noting that credit-as-true rule applies only when "the record has been
27

28     ORDER – 15

fully developed and further administrative proceedings would serve no useful purpose"). In this case, however, there is much conflicting evidence, and an ALJ who properly weighs that evidence would not necessarily find that Ms. Hall is disabled. *See Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (noting court's discretion not to remand for award of benefits when the "record as a whole creates serious doubt" as to whether the claimant is disabled). The court accordingly declines to remand for an award of benefits.

## IV.  CONCLUSION

For the reasons stated above, the court REVERSES the final decision of the Commissioner and REMANDS this case for additional proceedings consistent with this order. The clerk shall enter judgment for Ms. Hall.

DATED this 17th day of June, 2015.

Richard A Jones

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 16